**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICK ANTHONY and MAJOR COLEMAN III, | ) ) ) | |
| | ) | Case No. 13 C 3068 |
| Plaintiffs, | ) | |
| | ) | Honorable Joan B. Gottschall |
| v. | ) | |
| | ) | |
| VILLAGE OF SOUTH HOLLAND and, WARREN MILLSAPS, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Rick Anthony is a police officer in the Village of South Holland. On April 23, 2013, he sued the Village, alleging unlawful racial discrimination and retaliation. Anthony now moves for a temporary restraining order and preliminary injunction prohibiting the Village from requiring Anthony to submit to a fitness-for-duty psychological examination. He also seeks to enjoin the Village from disclosing his mental health records. He contends that the Village has ordered the fitness-for-duty examination to unlawfully retaliate against him for complaining about racial discrimination and for filing this lawsuit. For the following reasons, the motion is granted in part and denied in part. The court will not enjoin the Village from requiring Anthony to submit to a fitness-for-duty examination, but, as discussed below, the examination procedures must comply with the Illinois Developmental Disabilities and Mental Health Confidentiality Act ("Confidentiality Act").

On July 6, 2013, Anthony attended a roll call supervised by Lieutenant James Tavernaro. Several months earlier, Anthony had requested to take a vacation day on the 4th of July. The Village denied his request. At the July 6 roll call, Anthony asked Tavernaro why he had to work on the 4th of July while another officer was allowed to take the day off. Tavernaro told Anthony that he should take the grievance up with the Chief of Police. Anthony told Tavernaro, "This is bullshit." According to Tavernaro, Anthony stated that he knew that the other officer did not have to work because Anthony was "brown" and the other officer was not. (Def.'s Br. Ex. 1 (Tavernaro Decl.) ¶ 11.)[1]

Anthony then threw a cup of coffee toward a wastebasket, but the cup landed on the floor. Tavernaro told Anthony to clean up the coffee. Anthony responded that "the maintenance personnel could clean it up, and [he] was not clearing up shit." (Pl.'s Br. Ex. 3 (Anthony Decl.) ¶ 12.) Anthony then cleaned up the spill and told Tavernaro that he was experiencing anxiety and requested a personal illness day. Tavernaro asked Anthony if was able to drive home, and Anthony told him that he would sit in his car for a short time and then drive home. According to Tavernaro, Anthony also told him that Anthony was having a panic attack and that he was "liable to hurt someone if he stayed on duty." (Tavernaro Decl. ¶ 16.)

The next day, Chief of Police Gregory Baker called Anthony into his office. Baker told Anthony that he had heard about the incident that had occurred the day before and that Anthony would be suspended sixty days without pay until Baker investigated the incident. Baker later ordered Anthony to take a fitness-for-duty psychological examination on September 5, 2013,

---

[1] The Village has indicated that the reason the other officer did not work on the 4th of July was because the other officer works as an undercover officer for the U.S. Drug Enforcement Agency ("DEA"). As such, the DEA controls his schedule.

with Dr. Eric Ostrov.  (Pl.'s Br. Ex. 8 (Exam Order).)  The Exam Order stated that Baker was

ordering the exam because Anthony was seeing a physician for anxiety and because of his

"bizarre interaction with Lieutenant Tavernaro on or about July 6, 2013."  (*Id.*)  Before the exam,

Anthony was provided with a release authorizing Dr. Ostrov to "fully release any/all

conclusion(s) as well as the information upon which the conclusion(s) is/are based that he

obtains/concludes as to my psychological fitness . . . ."  (*Id.* Ex. 10 (Ostrov Release).)  Anthony's

attorney advised Anthony that he believed the release did not comply with the Health Insurance

Portability and Accountability Act ("HIPAA").  In light of Anthony's concerns about the release,

Dr. Ostrov declined to go forward with the examination.

Baker then ordered Anthony to take the examination with Dr. Sayed I. Ali on September

27, 2013.  At that examination, Anthony was provided with a different release.  This release

stated:

> I also understand that the professionals performing the evaluation may
> communicate with my employer and others involved in processing the
> consultation.  In other words, privileged communication/confidentiality does not
> apply because examiners will report and discuss any/all information and findings
> with those who have a need to know.

(*Id.* Ex. 12 (Ali Release).)  This time, Anthony signed the release, but wrote below his signature

that he reserved the right to challenge the legality of the scope of the release.  In light of this

reservation, Dr. Ali also declined to go forward with the examination.

Baker then suspended Anthony without pay for insubordination and asked Anthony to

explain the basis for his challenge to the medical release.  On October 1, 2013, Anthony's

attorneys submitted a memorandum to Baker and Village attorney Thomas McGuire explaining

Anthony's objections to the release.  At the same time, Anthony provided Baker and McGuire

with an executed release that was satisfactory to Anthony.  In an email to Anthony's attorney,

McGuire stated that Anthony's proposed release was "unacceptable" because it was "too

cumbersome and contains too many loopholes." (*Id.* Ex. 13 (Oct. 4, 2013, Email from McGuire to Ray Garza).) McGuire stated that the medical release "must irrevocably authorize the release of Dr. Ali's report stating whether or not Officer Anthony is fit to perform the duties of a Patrol Officer . . . ." (*Id.*)

Anthony remains suspended without pay. On October 29, 2013, Anthony moved for a temporary restraining order and preliminary injunction prohibiting the Village from requiring Anthony to submit to the examination and to consent to the Village's medical release as part of that examination. He claims that the Village has unlawfully retaliated against him in violation of the First Amendment and Title VII, 42 U.S.C. § 2000e, *et seq*. He also claims that the release that the Village has required him to execute violates HIPAA and the Confidentiality Act.

## II. LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Boucher v. Sch. Bd. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions. *See Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001). To obtain either a temporary restraining order or a preliminary injunction, Anthony must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm; (3) the harm he would suffer is greater than the harm that the temporary restraining order would inflict on the defendants; and (4) the temporary restraining order is in the public interest. *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). "[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary

4

relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

Anthony brings retaliation claims under Title VII and the First Amendment. A plaintiff may establish unlawful retaliation under Title VII using either the direct or indirect method of proof. Under the direct method, Anthony must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Under the indirect method, the first two elements remain the same, but instead of proving a direct causal link, Anthony must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination. *Id.* at 786-87. If Anthony establishes the prima facie case under the indirect method, the Village must articulate a nondiscriminatory reason for its action; if it does, the burden remains with Anthony to demonstrate that the Village's reason is pretextual. *Id.* at 787.

To establish a prima facie case of First Amendment retaliation, Anthony must allege that his speech was constitutionally protected, he suffered a deprivation likely to deter free speech, and his speech was a factor motivating the deprivation. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). If he makes this threshold showing, then the burden shifts to the Village to show that retaliation was not the but-for cause for the firing. *Id.* at 717. If the Village carries that burden, then Anthony must demonstrate that the Village's reason is pretextual. *Id.* at 717.

### III. ANALYSIS

#### A. Retaliation Claims

Anthony advances a number of reasons that he says demonstrate that he is likely to succeed on the merits of his retaliation claims. He first points to the timing of his suspension.

5

Anthony filed the complaint in this case on April 23, 2013. The court held an initial status hearing on June 25, 2013, and Baker suspended Anthony on July 7, 2013. Anthony also asserts that the Village's reasons for ordering the psychological examination were pretextual. While Baker claimed to order the examination in part because Anthony's attorney told McGuire that Anthony was being treated for anxiety, Anthony claims that the Village has known about Anthony's anxiety for years.

Anthony also accuses the Village and its attorneys of engaging in a pattern of retaliating against him. He points to an incident in 2006 when, shortly after filing a discrimination charge against the Village with the Illinois Department of Human Rights, Anthony was served with an order from then Chief of Police Millsaps. The order required Anthony to be interviewed about several topics, including why Anthony believed that the Village was prejudiced against him. (Pl.'s Br. Ex. 2 (Sept. 28, 2006 Memo) ¶ 7.) Anthony contends that he was interrogated in a hostile manner during the interview.

Anthony also relies heavily on the case of *McGreal v. Ostrov*, 368 F.3d 657 (7th Cir. 2004). In *McGreal*, the plaintiff claimed that the Village of Alsip retaliated against him by ordering him to undergo a fitness-for-duty examination. *Id.* at 668. McGreal was ordered to meet with the same Dr. Ostrov that Anthony was ordered to meet with in this case, who was hired by the same attorney, Thomas McGuire. *Id.* McGreal was also ordered to sign a waiver of his right to privacy under the threat of termination. *Id.*

Dr. Ostrov then wrote a 21-page evaluation of McGreal, which contained "a great deal of personal information about McGreal's family life, some of it very sensitive." *Id.* at 687. He forwarded the report to the Alsip Chief of Police, its Field Operations Manager, and McGuire,

without labeling the report "confidential." *Id.* McGreal then filed a complaint against Ostrov under the Confidentiality Act arising from the dissemination of Ostrov's report. *Id.* at 671.

The district court dismissed the Confidentiality Act claim. On appeal, the Seventh Circuit reversed, holding that the Confidentiality Act's provisions applied. *Id.* at 688. The court noted that "[t]he Confidentiality Act contains no disclosure exception for police departments performing mental health examinations to determine fitness for duty." *Id.* The court further noted that although the Confidentiality Act does allow for disclosure on consent, the form used for McGreal did not meet the standards set forth by Illinois law. *Id.* (citing 640 Ill. Comp. Stat. 110/5(b)). The court held that "defendants were not entitled under Illinois law to force the disclosure of the intimate and irrelevant details of McGreal's home life." *Id.* at 690.

The Village contends that Anthony's case is distinguishable from *McGreal* because of Anthony's admitted anxiety and his alleged statement about hurting himself and others. The Village claims that Baker suspended Anthony not to retaliate against him, but because of his outburst during the July 6 incident. In support of its position, the Village has submitted affidavits from Lieutenant Tavernaro and three other police officers who witnessed the July 6 incident. (*See* Def.'s Br. Exs. 1-4.)

According to Tavernaro, Anthony came to his office after the incident and told him that he was sick and experiencing an anxiety attack. He then told Tavernaro that he was having a panic attack and that he was "liable to hurt someone if he stayed on duty." (*Id.* Ex. 1 (Tavernaro Aff.) ¶ 16.) Marita Patterson, another officer at the roll call, states that she overheard Anthony tell Tavernaro that Anthony needed to go home because he was having an anxiety attack and that he was afraid that he was going to hurt himself or someone else. (*Id.* Ex. 3 (Patterson Aff.).) The other two officers, Brodrick Burke and Marcel Hartwell, were not present when Anthony

allegedly told Tavernaro that he might hurt someone, but their versions of the July 6 incident are otherwise consistent with Tavernaro's. (*Id.* Exs. 2, 4.) Chief Baker also submitted an affidavit in which he states that he was notified that Anthony told Tavernaro that he was suffering from anxiety and that he was going to hurt himself or someone else. (*Id.* Ex. 5 ¶ 14.) Baker says that this was the sole basis for his request for a fitness-for-duty examination.

Based on the record before it at this point in time, the court cannot conclude that Anthony has demonstrated a likelihood of success on his retaliation claims. The Village has articulated legitimate reasons for suspending Anthony and requiring him to undergo a fitness-for-duty examination, and Anthony has not shown that these reasons are pretextual. The timing of the suspension cuts in favor of the Village, not Anthony, who filed his complaint on April 23, 2013. The Village took no action against him until July 7, 2013, immediately after Anthony told Tavernaro that he was experiencing anxiety and needed to take a personal illness day. Anthony does not dispute this. The fact that the Village may have known about Anthony's anxiety issues before July 6 does not show that the Village's reasons were pretextual, given the seriousness of the July 6 incident.

Even if Anthony were likely to succeed on the merits, he also has not shown that the harm he would suffer is greater than the harm that would be inflicted on the Village were the temporary restraining order issued, or that a temporary restraining order is in the public interest. Anthony notes that he has an unblemished record and has received numerous commendations, but he ultimately agrees that there is a strong public interest in assuring that police officers have the psychological ability to perform their duties. *See Krocka v. City of Chi.*, 203 F.3d 507, 515 (7th Cir. 2000) ("The position of Chicago police officer certainly presents significant safety concerns, not only for other CPD employees but for the public at large. It was entirely

reasonable, and even responsible, for CPD to evaluate [plaintiff's] fitness for duty once it learned that he was experiencing difficulties with his mental health.") The court finds that the extraordinary remedy of compelling a police department to reinstate an employee who admittedly suffers from anxiety without first undergoing a fitness-for-duty examination would not be appropriate, especially in light of the scant evidentiary record before the court at this time.

## B. HIPAA / Confidentiality Act Claims

Anthony also requests that if he must undergo a psychological evaluation, that he not be compelled to sign an irrevocable release of his mental health records. The court finds that Anthony is entitled to a preliminary injunction prohibiting the Village from requiring him to "irrevocably" release his mental health records. The Confidentiality Act expressly requires that a consent form must include "the right to revoke the consent at any time." 740 Ill. Comp. Stat. 110/5(b). It also must specify (1) the person or agency to whom disclosure is to be made; (2) the purpose for which disclosure is to be made; (3) the nature of the information to be disclosed; (4) the right to inspect and copy the information to be disclosed; (5) the consequences of a refusal to consent, if any; and (6) the calendar date on which the consent expires. *Id.*; *see also McGreal*, 368 F.3d at 688 (finding that the Confidentiality Act applied to McGreal's fitness-for-duty examination and that the consent form did not meet standards set forth by Illinois law).

There can be no serious dispute that the Village's consent form does not conform to these requirements, and, indeed, the Village does not argue that it does. (*See* Def.'s Br. at 11.) Instead, the Village argues that Anthony has not exhausted his administrative remedies on this issue, that disclosure to certain parties is necessary to determine whether Anthony suffered a non-duty or duty-related mental illness, and that he has waived any privilege under the Confidentiality Act by placing his mental condition in issue. Each of these arguments is flawed.

9

Anthony appears to be diligently exhausting his administrative remedies. He has demonstrated that, ultimately, he would likely succeed on the merits of his claim, and the Village cannot compel him to sign an illegal release simply because it scheduled his psychological examination before he could exhaust all administrative remedies. Furthermore, as the court noted in *McGreal*, "[t]he Confidentiality Act contains no disclosure exception for police departments performing mental health examinations to determine fitness for duty." 368 F.3d at 688. Nor has Anthony waived his rights simply by speaking with Tavernaro, as he has not "introduce[d] his mental condition as an element of his claim or defense" in a civil or administrative proceeding. *See* 740 Ill. Comp. Stat. 110/10(a)(1).

Anthony has shown a likelihood of success on the merits of this claim. He has also demonstrated an irreparable injury, given the serious privacy concerns that are at stake. *See McGreal*, 368 F.3d at 688 (noting that Ostrov's 21-page report contained very sensitive information about McGreal's personal life). This harm outweighs any harm that would be suffered by the Village, especially because Anthony has agreed that if he is determined to be unfit, this finding may be communicated to the Chief of Police. *See id.* at 688-89. ("The Court also noted that it was in the public interest to zealously guard against erosion of the confidentiality provision. . . . '[A]nyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the Act.'") (quoting *Norskog v. Pfiel*, 755 N.E.2d 1, 10 (Ill. 2001)).

The court finds that Anthony is entitled to a preliminary injunction prohibiting the Village from requiring him to irrevocably release his mental health records.[2]

---

[2] Both parties have informed the court that they are not requesting a hearing on the preliminary injunction motion at this time. *See* Dkt. [36]. If, in light of this opinion, the Village wishes the

## IV. CONCLUSION

For the reasons stated above, Anthony's motion for a temporary restraining order and preliminary injunction is granted in part and denied in part. Anthony is directed to present the court with a proposed order that is consistent with this opinion. At the time the order is presented, the parties should address what amount of security, if any, they consider proper under Federal Rule of Civil Procedure 65(c).

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: November 8, 2013

---

court to hold a hearing on the motion for a preliminary injunction, it should request a hearing within fourteen days of the issuance of this opinion.